**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Joseph Molnar, et al., | ) | **CASE NO. 1:04 CV 2350** |
| | ) | |
| Plaintiffs, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| G& S Metal Products Co., Inc., et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |


<u>Introduction</u>

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc.

15). For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

<u>Facts</u>

Plaintiffs, Joseph Molnar and Veronika Molnar, filed this case in the Cuyahoga

County Court of Common Pleas.  Defendants, G&S Metal Products Co., Inc., Mark Schwartz

and Robert Greenberger, thereafter removed the First Amended Complaint to this Court on

the basis of federal question jurisdiction.

1

Plaintiff Joseph Molnar (hereafter Molnar), was hired by Accurate Machine Tool in 1995 as a tool and die maker at the age of 58.  (Molnar depo. 21, 23).  Accurate manufactured special machinery for the automotive and aircraft industries.  Accurate was a separate corporation from G&S Metals, but both companies were owned by defendant Schwartz and his father, Harry.  (Michael Zets aff.).

In 1998, Molnar observed that Accurate was in financial trouble and began looking for more stable employment.  He obtained a job offer from Belcan Engineering Group.  Upon receipt of this offer, Molnar submitted his resignation to Michael Zets, Accurate's Chief Executive Officer.  (Molnar depo. 24, 39, 50, 60 and Ex.; pltfs. Resp. to defendants' interr. No. 13; Zets aff.).  Zets, who considered Molnar a "qualified and hard-working tool and die maker" as well as "very good general machinist," received Molnar's resignation in March 1998.  Zets did not want Molnar to leave because he was a "key employee" with a "great deal of experience."   Zets informed Schwartz of Molnar's resignation and that it "was important to our operation that Mr. Molnar not resign."  Schwartz told Zets to send Molnar to G&S Metal's offices to meet with Schwartz.  (Zets aff.).

Molnar met with Mark and Harry Schwartz who assured Molnar that he would have a job as long as G&S Metals stayed in business and that he could work for Accurate as long as he wanted and then for G&S Metals.  Molnar was also promised a raise and a company car.  Plaintiff then informed Zets of the new deal.  (Molnar depo. 24-28, 32, 50-59, 84-86).

Zets was informed by Molnar that he had been assured a job as long as he wanted to work, even if Accurate closed in which event, he would work for G&S Metals.  Molnar also informed Zets of the raise and car.  The following day, Zets met with Molnar and Zets wrote

2

out an itemized explanation about what Accurate would offer Molnar compared to what Molnar would earn with Belcan Engineering Group.   Zets also spoke with Schwartz who reiterated what had been offered.  (Zets aff. and Ex.B).

Based on the Schwartz's promises, plaintiff withdrew his resignation by ripping up the letter and did not accept Belcan's job offer.  Molnar then received the raise and car.  (Molnar depo. 27, 40, 47-48, 63).

Accurate wrapped up its business operations by the end of 2000 and Molnar was added to the payroll of G&S in 2001. (Michael Zets aff.)  Molnar transferred to G&S Metals's plant where he was assigned to work as a punch press operator.  (Molnar depo. 68, 99).

In 2001, when Molnar turned 65, Schwartz asked him how long he planned on working.  Molnar predicted that he could work another 8-10 years.  Schwartz replied that they would see how he was "holding up" at age 70 and "talk about it."  (Molnar depo. 90-91, 93).

In March 2004, the union at G&S, through Jerry Hager, the chief union steward, filed a grievance with the company alleging that Molnar was doing union-related work as a press operator although he was non-union.  The union withdrew the grievance after learning that Molnar could lose his job over it.   (Hager depo. 6-9, 24-25; Ex. A)

In March 2004, Molnar's supervisor, defendant Robert Greenberger, accused Molnar of falling asleep at his machine.  When Molnar denied this, Greenberger told him that he should retire because he was too tired.  Plaintiff told him that he did not want to retire. (Molnar depo. 94-95, 104, 106).  Greenberger again told Molnar in April and May 2004 that he had to retire.  (*Id.* 107-108).  Molnar reported to Schwartz that Greenberger was pressuring him to retire and in June 2004, asked Schwartz to let him stay because he did not want to

retire. Schwartz told Molnar that he had to retire.  (*Id.* 108-109, 112-113).

Plaintiff asserts that on June 18, 2004, G&S Metal gave plaintiff a paycheck marked "final paycheck" and he did not return to work after that day.

The First Amended Complaint sets forth six claims for relief.  Count One alleges age discrimination under Ohio Revised Code §§ 4112.02(N) and 4112.99.  Count Two alleges breach of contract under Ohio law. Count Three alleges promissory estoppel.  Count Four alleges loss of  consortium on behalf of Veronika Molnar.  Count Five alleges age discrimination under the Age Discrimination in Employment Act (ADEA).  Count Six alleges age discrimination under Ohio Revised Code § 4112.14.

This matter is before the Court upon defendants' Motion for Summary Judgment.

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242,

4

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of [his] pleadings, but [his
> response], by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is genuine issue
> for trial.  If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence

of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the

evidence is "merely colorable" and not "significantly probative," the court may decide the

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>Discussion</u>**

**(1) Age Discrimination**

Count Five alleges age discrimination under the ADEA.[1]

The burden-shifting evidentiary framework originally articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973) and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256-59, 101 S.Ct. 1089, 1095-97, 67 L.Ed.2d 207 (1981) is utilized in analyzing a claim of age discrimination under the ADEA.  Accordingly, to establish a prima facie case in the absence of direct evidence, a plaintiff must demonstrate that: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he was rejected, a substantially younger applicant was selected."  *Burzynski v. Cohen*, 264 F.3d 611, 621-622 (6th Cir. 2001) (citing *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir.1998)).  With regard to the fourth element, plaintiff can also demonstrate that he was replaced by a person outside of the protected class or, in a disparate treatment case, that he was treated differently than similarly-situated individuals.  *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535 (6th Cir. 2002).   As to this final element, the United States Supreme Court has held that plaintiff's replacement does not have to be under 40 (i.e. outside the protected class) but must be substantially younger. *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 312 (1996).   The Sixth Circuit has held that "in the absence of direct evidence that the

---

[1]       Counts One and Six allege age discrimination under Ohio Revised Code §§ 4112.02(N), 4412.99 and 4112.14.  Plaintiffs do not dispute that summary judgment is appropriate on these claims because Molnar has elected to file an administrative charge of discrimination.

6

employer considered age to be significant, an age difference of six years or less ... is not

significant." *Walcott v. City of Cleveland*, 123 Fed.Appx. 171, 178 (6th Cir. 2005) (citing

*Grosjean v. First Energy Corp*., 349 F.3d 332, 340 (6th Cir.2003) ).

      If a prima facie case is established, the burden of production shifts to the defendant to

articulate a non-discriminatory reason for its action.  If the defendant states such a reason, "the

plaintiff must then demonstrate by a preponderance of the evidence that the defendant's

proffered reason was a pretext for age discrimination."  *Burzynski,* 264 F.3d at 621-622.  In

order to demonstrate pretext, "plaintiff must produce sufficient evidence from which the jury

could 'reasonably reject the defendant's explanation' and infer that [defendant] 'intentionally

discriminated' against him." *Leonard*, 6 Fed.Appx. at 228 (citing *St. Mary's Honor Center v.*

*Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ).  As recognized by the

Sixth Circuit, "[t]he Supreme Court recently held that a plaintiff's prima facie case, combined

with sufficient evidence to find that the employer's asserted justification is false, may permit

the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (quoting *Reeves*

*v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105

(2000) ).  Finally, *Manzer, supra*, reiterated that pretext may be proven by setting forth

evidence "(1) that defendant's proffered reasons have no basis in fact, (2) that the proffered

reasons did not actually motivate the discharge, or (3) that they were insufficient to motivate

discharge." *Id.* (citing *Manzer,* 29 F.3d at 1084).

      Defendants argue that plaintiff cannot establish a prima facie case because he fails to

demonstrate that he was replaced by a substantially younger person or someone outside the

protected class.  Defendants point to the Responses to Plaintiffs' First Set of Interrogatories,

Numbers 15 and 16.  Therein defendants state that Calvin Belle, age 57, and other

subordinates of Belle, are performing Molnar's job duties in addition to their previous tasks.

(Doc. 15 Ex. A). In their reply, defendants additionally point to Keith Kerr's deposition

testimony that existing employees took over Molnar's duties.  (Kerr depo. 22-23).

Plaintiffs do not dispute that they are unable to prove their prima facie case through

the circumstantial method but argue that there is direct evidence of age-related bias and,

therefore, the four-part prima facie burden is avoided.

The Sixth Circuit has stated,

> A 'direct evidence' discrimination case requires proof which, if believed, requires the
> conclusion that unlawful discrimination was at least a motivating factor in the
> employer's actions.  Consistent with this definition, direct evidence of discrimination
> does not require a factfinder to draw any inferences in order to conclude that the
> challenged employment action was motivated at least in part by prejudice against
> members of the protected group.

*Harris v. Giant Eagle Inc.*, 133 Fed.Appx. 288, 293 (6th Cir. 2005) (citations omitted).

In *Peters v. Lincoln Electric Co.,* 285 F.3d 456, 477-478 (6th Cir. 2002) (citing *Cooley*

*v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994) ), the Sixth Circuit recognized four

factors to be evaluated in considering allegedly age-biased remarks:

> (1) whether the statements were made by a decision-maker or by an agent within the
> scope of his employment; (2) whether the statements were related to the
> decision-making process; (3) whether the statements were more than merely vague,
> ambiguous, or isolated remarks; and (4) whether they were made proximate in time to
> the act of termination.

Evidence of repeated inquiries regarding retirement and suggestions that an employee "start

thinking about retirement" might be sufficient to allow a rational factfinder to conclude that

an employer harbors some age-related bias.  *Leonard v. Twin Towers,* 6 Fed. Appx. 223 (6th

8

Cir. 2001).

Pointing to portions of Molnar's deposition testimony, plaintiffs assert that both Greenberger and Schwartz initiated retirement discussions knowing that Molnar wanted to continue working:

Q.  Did [Schwartz] say anything to you about retiring?

A.  Yes.

Q.  O.K.  When?

A.  In 2004, June, beginning of June, when I talked to  [Schwartz] and I'm telling him Greenberger, he's pressuring me to retire, and he says you just have to.

(Molnar depo. 93-94). Plaintiff testified about three conversations with Greenberger:

A.  Bob Greenberger, he called me into his office [in March 2004]; first time he accused me of fell asleep on the job and, obviously, I'm too tired; I should retire.  And I told him I don't feel like I want to retire yet; I don't feel tired; just that's it.

I told him I had to talk with Mark Schwartz on my birthday or a little after my birthday, and he don't know nothing about that.  Okay.

(*Id.* 106).

Q.  Okay.  And when was the second time?

A. Second time in early part of April.

Q.  Tell me about that conversation.

A.  He- He told me all about the union.  His way of thinking was changed from 'fell asleep' to 'the union problem.'  Now the union wants me to retire.  Okay.

(*Id.* 107).

A.  Then the third conversation with Bob Greenberger, when he told me- - That was in May.  And he told me, yes, you have to retire, because he already made some arrangements.  Now, what arrangements, I don't know.

9

Q.  And you said that was in May?

A.  Yeah.  Then in June, I stopped Mark Schwartz, and I asked him to let me stay on
because I don't want to retire.  I remind him about the conversation that we had on my
birthday.  And Mark Schwartz, he told me, he said, No, you just have to retire; you
started all this and you just have to do it.

Q.  And when he said, 'you started all this,' do you know what he was talking about?

A.  Well, he talk about retirement, but I didn't start it.

(*Id.* 107-108).

Q.  Okay.  when you spoke with Mr. Schwartz in June, did you ask him what
arrangements had been made?

A.  When I talked to Mark Schwartz and I told him I don't want to retire, I don't
nothing- - I said, you remember on my birthday, you told me I can work here 70.  Then
he told me- - he says, 'I don't recall it.'

Q.  Okay.  My question was: When you spoke with Mark in June, did you ask him
what arrangements were being made?

A.  Only thing I was able to talk to him about, I told him I don't want to retirement, I
don't want to retire.  And he says, 'You just have to.'

(*Id.* 112-113).

Defendants do not address whether this testimony may constitute direct evidence of

age discrimination but argue that three cases plaintiffs rely on are inapposite.  Defendants

assert that *Kohmescher v. Kroger Company*, 61 Ohio St.3d 501 (1991) is distinguishable

because there was a written memorandum which acknowledged that plaintiff was specifically

selected for a reduction-in-force because of his age.  Defendants assert that while such a

memorandum is direct evidence of age discrimination, no such evidence exists here.

Defendants contend that *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596 (D. Maine 1994)

is inapplicable because the case discussed the evidence of bias in the context of pretext and

10

not direct evidence, and that plaintiff additionally attempted to establish a pattern of discrimination.  Finally, defendants assert that *Rottersman v. CBS Inc.,* 726 F.Supp. 484 (S.D.N.Y. 1989) also discussed evidence of repeated inquiries about retirement in the context of pretext, and not as direct evidence.

Notwithstanding these distinctions, the Court must analyze the evidence presented in this case to determine whether it amounts to direct evidence.

Construing the evidence in the light most favorable to the plaintiffs, the deposition testimony is enough to show that Schwartz and Greenberger may have harbored some age-related bias against Molnar.  Evaluating the statements in the context of the four factors set forth above, a reasonable factfinder could find the comments to be direct evidence of  age discrimination.

Schwartz is president and CEO of G&S Metals and plaintiff's supervisor, Greenberger, is the executive vice-president. (Schwartz depo. 6; Greenbeger depo. 4; Doc. 15 Ex. E).  Thus, it may be inferred that they were decision makers.  The statements allegedly occurred in the months just prior to Molnar's separation from employment and, thus, could have been related to the decision-making process and were proximate in time to the separation.  Finally, the statements could be considered more than merely vague, ambiguous, or isolated remarks.  Molnar testified that in March, April and May 2004, Greenberger told him he should retire and had to retire.  Molnar further testified that at the beginning of June 2004 when he told Schwartz that Greenberger was pressuring him to retire, Schwartz said "you just have to."  If believed, Molnar's testimony shows that defendants told Molnar he had to retire, despite the fact that Molnar did not want to.  This evidence could show that unlawful

11

discrimination was at least a motivating factor in Molnar's separation from G&S Metals and, therefore, could amount to direct evidence.

Having established that at least a question of fact exists as to whether direct evidence of age discrimination exists, a prima facie case is established and the Court proceeds to whether a legitimate non-discriminatory reason for the alleged adverse employment action has been stated by defendants.  Defendants point to the Responses to Plaintiffs' First Set of Interrogatories wherein it is stated that Molnar was not fired but that plaintiff informed defendants in March 2004 that he intended to retire at the end of June 2004.  (*Id.* Nos. 25, 17, 19).  Accordingly, defendants contend that the legitimate reason for Molnar's separation of employment is that he voluntarily retired.  Defendants further state, but do not point to specific evidence, that when plaintiff sought to rescind the decision to retire, defendants denied the request.

Plaintiffs assert that this reason is pretextual, pointing to the following evidence.

- Molnar testified that he never resigned. (Molnar depo. 56).   He further testified:

Q.  I want to ask you about your separation from employment and how that came about.  As you know, Mr. Greenberger and Mr. Schwartz are taking the position that you informed them that you wanted to retire.  You understand that; right?

A.  I understand this, but it's not true.

(*Id.* 90).

- Co-worker and union steward Jerry Hager testified that Greenberger indicated at the second step meeting that Molnar could lose his job if the grievance were successful. However, Greenberger never indicated to the union that Molnar intended to retire. (Hager depo. 9, 11).

12

- Jerry Hager, also testified that in late 2003 or early 2004 Molnar told him he wanted to work until he was 70 and he mentioned health insurance as one reason he wanted to continue working.  (Hager depo. 11-13).  Additionally, Hager testified that Molnar told him shortly before he left that the company was pressuring him to resign and "they're telling him to pack up his tools and leave during shutdown."  Molnar told Hager about a month before he left that he was not happy about leaving.  (*Id.* 16-17, 18, 26).

- A manager, Keith Kerr, testified that he had no knowledge that Molnar intended to retire.  (Kerr depo. 12, 13, 20).   Another co-worker, Calvin Belle, testified that Molnar told him that the company wanted him to retire.  (Belle depo. 10-11).

- In early June 2004, a letter was written on Molnar's behalf by an attorney to a law firm representing G&S.  The letter indicates that Greenberger was pressuring Molnar to retire and that Schwartz had promised Molnar a job.  (Molnar depo. Ex.).

- Molnar testified that after his employment with defendants terminated in June, he began working for another company in August, making $17.00 per hour.  This is less than he was earning with G&S.  (Molnar depo. 51-53; Zets aff. Ex. B).

    In their motion, defendants do not argue that plaintiffs are unable to show that defendants' legitimate reason for the alleged adverse employment action is pretextual.  In reply, defendants assert that because plaintiffs failed to establish a prima facie case, the evidence regarding pretext is irrelevant.  Therefore, defendants do not address plaintiffs' evidence regarding pretext except to assert in one sentence, "Defendants also note that the large majority of the evidence relied upon by Plaintiff, including various deposition excerpts and the affidavit of Mr. Zets, cite to statements by them which are inadmissible hearsay."

13

(Doc. 27 at 4).  Defendants do not attempt to identify any statements in particular.

The evidence submitted by plaintiffs is sufficient to raise an issue of fact as to whether defendants' asserted reason for Molnar's separation (i.e., Molnar voluntarily retired) is pretextual.  Specifically, plaintiff denied that he voluntarily retired.  Co-workers testified that plaintiff did not want to retire, was unhappy about it and it was the company that wanted him to retire.  Plaintiff took another job for less money after he left defendants' employ.

For these reasons, summary judgment is denied as to Count Five.

**(2) Breach of Implied Contract and Promissory Estoppel**

Counts Two and Three are premised on the alleged promise by defendant that Molnar would always have a job.

In Ohio, employment is generally presumed to be at-will which is terminable at any time for any reason by either party. *Vickers v. Wren Industries, Inc.*, 2005 WL 1685101, *10 (Ohio App. 2d  Dist. July 8, 2005) (citations omitted). An implied contract or promissory estoppel may take a case out of the employment at will doctrine.  *Id.*

Because employment is presumed to be at-will, the party asserting an implied contract of employment has a heavy burden and must prove the existence of each element necessary to the formation of a contract.  *Urfer v. St. Vincent Medical Center,* 2000 WL 1595717 (Ohio App. 6th Dist. 2000) (citations omitted) and *Brown v. Lowe's, Inc.*, 2004 WL 2293386 (Ohio App. 11th Dist. Oct. 8, 2004) ("The burden is upon the party asserting the existence of an employment contract to prove each element necessary for the formation of the contract.") Therefore, the employee asserting the existence of an implied contract must prove the existence of an offer, acceptance, consideration and mutual assent.  *Id.*

14

To make a prima facie case for promissory estoppel, the employee "must show: (1) a clear and unambiguous promise; (2) reliance upon the promise; (3) reliance that is both reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." *Imbrogno v. Mimrx.com, Inc.*, 2003 WL 22707792 (Ohio App. 10th Dist. Nov. 18, 2003) (citing *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, 260 (1995)). Furthermore, "courts have held that in the absence of a specific promise of continued employment, a promise of future benefits or opportunities does not support a promissory estoppel exception to the employment-at-will doctrine." *Baker v. Northwest Hauling*, 2003 WL 21489619 (Ohio App. 6th Dist. June 30, 2003) (citations omitted).

Claims for breach of implied contract and promissory estoppel may be analyzed together because the doctrine of promissory estoppel is applicable and binding to at-will employment agreements. *See Vickers, supra.*

Defendants point to the *G&S Metals Products Co. Employee Handbook* which states, "[T]his Handbook does not constitute an express or implied contract of employment."  (Doc. 15 Ex. D).  Defendants additionally argue that plaintiffs cannot establish any definite term of employment and, therefore, the breach of implied contract and promissory estoppel claims must fail.  Defendants point to Monar's deposition testimony that the basis of these claims is the promise made to him in 1998 that he would have a job as long as G&S stayed in business. (Molnar depo. 24, 27, 29-30).

Plaintiffs argue that an implied contract exists based on Harry Schwartz's promise, in response to Molnar's concern about job stability, that he would have a job for as long as G&S Metals stayed in business.  Plaintiffs assert that this promise was "backed up" by a raise and a

15

company car.  Similarly, plaintiffs assert this forms the basis for a promissory estoppel claim and that Molnar justifiably relied on these promises to his detriment by turning down his other job offer.  Plaintiffs assert that the Schwartzes knew Molnar would so rely given that he was called in for the meeting in response to his offer of resignation after receipt of the other job offer.

Because the evidence does not show a clear and unambiguous promise that plaintiff would be employed permanently, or for a specific term, the breach of implied contract and promissory estoppel claims fail.  *See Vickers v. Wren Industries, Inc.,* 2005 WL 1685101 (Ohio App. 2d Dist. July 8, 2005) (Statements by managers to plaintiff that "you don't ever have to worry... as long as our doors are open, you've got a - you have got a job" and "[the manager] asked me what my plans were for the future and I says just stay working.  He says we would like for you to stay here and retire.  And I said I would like to do that" were insufficient as a matter of law to constitute a claim for lifetime employment.), *Lenzo v. New Resources Corp.,* 1998 WL 141190 (Ohio App. 8th Dist. March 26, 1998) (In "the absence of evidence of an agreement for specific terms, at-will employment status prevails.  In the absence of a specific time period, ... promissory estoppel [does] not apply either."), *Andres v. Drug Emporium, Inc.,* 2001 WL 987804 (Ohio App. 10th Dist. Aug. 30, 2001) (Testimony that the company's vice-president and CEO made statements that plaintiff's employment would be "long-term" does not show that a clear and unambiguous promise of continued employment was made.), *Pupillo v. St. Vincent Charity Hospital,* 2001 WL 1075728 (Ohio App. 8th Dist. Sept. 13, 2001) ("[P]romises of  continued employment must be for a specific term in order to establish a prima facie claim for promissory estoppel.") and *Daup v. Tower Cellular, Inc.,* 136

16

Ohio App.3d 555 (10th Dist. 2000) ("A number of appellate courts have held that statements praising an employee's work performance or discussions regarding future opportunities are insufficient to establish an express or implied contract of employment altering an at-will relationship."  Citing, for example,  *Clipson v. Schlessman*, 89 Ohio App.3d 230, 233 (1993)(statements to employee that he was "in a good position with the company" and that he would "never have to worry about [his] job" indicate, at best, praise of employee's performance and discussions of his future, but not evidence of an employment promise) and *Peters v. Mansfield Screw Machine Products*, 73 Ohio App.3d 197 (1991) (supervisor's statement that employee would have a job as long as the supervisor was there did not alter employee's at-will status) ).

Based on this precedent, Schwartz's statement that Molar would have a job as long as G&S was in business is insufficient to take Molnar's employment outside the at-will context and guarantee him permanent, lifetime employment.   Furthermore, Molnar worked for Accurate at the time of the alleged promise and he informed Michael Zets, Accurate's CEO, of the alleged promise.  Zets met with Molnar and wrote out an itemized explanation, dated April 1, 1998, indicating what Accurate would offer Molnar compared to what Molnar would earn at Belcan, the company that had offered him a position.   The notes also indicate, "staying... keeps vacation- keeps seniority- no lapse in health and life benefits."  (Zets aff and Ex. B).  The notes do not expressly reference a promise of continued employment or a duration of term.

For these reasons, summary judgment is granted as to Counts Two and Three.

**(3) Loss of Consortium**

17

Count Four alleges loss of consortium on behalf of Veronika Molnar.   Defendants move for summary judgment on the basis that, *inter alia,* Veronika Molnar cannot produce any evidence as to damages suffered.  Plaintiffs did not address this claim in their brief. Therefore, plaintiffs have failed in their burden of sustaining this claim.  Once defendants identified a lack of evidence in the record, plaintiffs are not permitted to rest upon the mere allegations of their pleadings, but must respond by affidavits, or otherwise, demonstrating specific facts showing that there is genuine issue for trial.  Because plaintiffs failed to so respond, summary judgment, is appropriate.

**Conclusion**

For the foregoing reasons, defendant's motion is granted as to all counts except Count Five.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
UNITED STATES DISTRICT JUDGE

Dated:  8/30/05

18